UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

FILED BY_____D.C.

SEP 3 2020

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

Grace Solis and
Shirley Solis
    Plaintiffs

v.                                            Case No. 1:19-cv-24042-KMW

CITIBANK, N.A. and
CITIMORTGAGE, INC.
    Defendants

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

Plaintiffs, Grace Solis and Shirley Solis, *pro se*, file their Opposition to Defendants' Motion to Dismiss the Second Amended Complaint (SAC) and state as follows:

1. It is not necessary for the Plaintiffs to prove their claims in their complaint, the Plaintiffs have to put forth a complaint that plausibly alleges violations of law. Plaintiffs voluminous proof that they have repeatedly requested an accurate accounting of the credit line has been attached to the complaint. The Defendants are just putting forth every effort to not provide this information which is directly supported by the fact that the Consumer Financial Protection Bureau fined them 28 million dollars in 2017 for their refusal to cooperate and assist consumers in loan modifications and continual misreporting of credit tradeline information to the Consumer Reporting Agencies..

2. The core of the Defendants' response is that the Defendants' did not have to respond to Plaintiff's repeated requests for the calculation of the interest rate to include the margin and index utilized. If the Defendants refuse to provide this vital information to the Plaintiffs, how do Plaintiffs know what is exactly owed, especially due to the Defendants' waiver of over ten

1

thousand dollars in fees in May 2018, exhibit A? Furthermore, the Defendants have again refused to provide these documents in order to correctly calculate the interest rate and interest amounts due these items in their Response to the Request for Production of Documents, number 38 for CITI and number 39 for CMI, attached as Exhibit B and C respectively. It seems that the Defendants do not want the Plaintiffs to pay the correct amounts due and owing, they want to instead foreclose on the Plaintiffs' homestead. The Defendants response to the Plaintiffs discovery requests also demonstrate what little regard they have for their consumers by basically stating in all the discovery that everything is burdensome and harassment to them but it is fine if the Plaintiffs are harassed by realtors, foreclosure companies, investors etc. for their home.

## I. Background

Defendants' allegations that they do not understand the complaint is belied by the way they defend themselves. Defendants are under a duty to provide correctly calculated interest amounts otherwise they can charge anything they like. Therefore, Solis1 has continuously requested the interest calculations in order to verify that the correct amounts are being requested. The Defendants' refusal to provide this information to date is astounding. They have even refused to provide the correct calculations in the discovery request. CMI waived $10,127.09 and claimed that they could be deemed uncollectible. Why? Solis1 repeated asked why this was waived because maybe there is more money that is not owed. Solis1 felt that there was something wrong since she began asking the Defendants regarding the amounts owed and their refusal to respond. Is there a reason why the Defendants cannot provide an accounting of the amounts owed including how the interest rates were calculated? Why all this mystery and refusal to provide the amounts owed in discovery? Do the Defendants want to foreclose on the Plaintiffs' property and deprive them of their home?

A creditor may change the index and margin used under a variable rate HELOC if the original index becomes unavailable, as long as historical fluctuations in the two indices were substantially similar and the new index and margin will produce a "substantially similar" new APR see 15 U.S.C. § 1647(c)(2)(A); Reg. Z § 1026.40(f)(3)(ii); Official Interpretations § 1026.40(f)(3)(ii)-1. Historically, this provision has rarely been used. Many HELOCs lenders use the LIBOR (London Interbank Offered Rate) as an index, and the LIBOR may become unavailable or at least unreliable by the end of 2021. Tick Tock: The End of LIBOR, The Economist, Sept. 27, 2018, available at www.economist.com. As a result, creditors will likely seek to change the index and margin used for outstanding HELOCs when that occurs.

Plaintiffs alleged that Defendants have not provided to Plaintiffs how the alleged amount owed was calculated since 2010. Plaintiffs do not know what is owed and if it was correctly calculated because on the face of the Agreement, it states an Index, not THE INDEX. It states that the APR will vary as the Index varies. Which index was used? Was it the London Inter Bank Offered Rate (LIBOR), Cost of Funds Index (COFI), Cost of Savings Index (COSI), etc.? Defendants forget that they were discovered rigging the LIBOR rate as far back as 2008 and 2009 and it settled.

Solis1 began paying the HELOC in 2005 when it was in the interest only stage, which was the first ten years of the credit line. Since 2010, Solis1 has repeatedly requested the calculations in order to determine what is owed. If Solis1 does not know what is owed, then she also does not know if the Defendants accurately reported the account to the credit reporting agencies. Despite the attempted communication by the Plaintiffs for years, the Defendants have now twice tried to foreclose on the Plaintiffs without responding to Plaintiffs questions, which is

3

contradictory to consumer laws. Not only is it contradictory to consumer laws, it directly contradicts the HELOC Agreement created by the Defendants which states:

### YOUR RIGHTS AND CITIBANK'S RESPONSIBILITIES AFTER CITIBANK RECEIVES YOUR WRITTEN NOTICE

Citibank must acknowledge your letter within 30 day, unless Citibank has corrected the error by then. Within 90 days, Citibank must either correct the error or explain why Citibank believes the bill was correct. After Citibank receives your letter, Citibank cannot try to collect any amount you question, or report you as delinquent. Citibank can continue to bill you for the amount you question, including Finance Charges, and Citibank can apply any unpaid amount against your credit limit. You do not have to pay any questioned amount while Citibank is investigating, but you are still obligated to pay the parts of your bill that are not in question. (page 8 of 9).

Thus, the Defendants were obliged to answer each letter completely, not partially. Not only were they supposed to answer, they could not report derogatory information until the questions were answered.

Solis2 may not be on the HELOC but she is on the mortgage and she does live in the home. The Defendants' actions have also affected the Plaintiffs due to their failure to simply respond to the multiple letters received directly from Solis1 and from the CRAs. There has been more than eight years of mental distress, anguish, stress, frustration and embarrassment because the Plaintiffs cannot resume to pay the HELOC due to the Defendants failure to provide accurate accounting of the credit line. It is terrifying to face foreclosure and even worse when you have done everything the law and the agreement says to do and you still cannot receive an accurate accounting of the credit line. The Defendants have already been fined twenty-eight million dollars by the Consumer Financial Protection Bureau (CFPB) for their failure to assist consumers trying to save their homes and reporting inaccurate information to the credit reporting agencies (CRAs)

## II. Plaintiff's Amended Complaint Fails to Meet Basic Pleading Standards Under Fed. R. Civ. P. 8 & 12(b)

Defendants state that the complaint is confusing because Plaintiffs do not know which Defendant caused which problem. That is exactly the problem Plaintiffs are having. Solis1 would write to CITI and CMI responded by waiving interest amounts but then would refuse to clarify why these amounts were waived. These Defendants then sold the servicing of the HELOC to CENTRAL LOAN ADMINISTRATION AND REPORTING (CENLAR) in October 2019. Solis1 has repeatedly requested Qualified Written Requests from CENLAR beginning in November 2019 regarding the interest amount calculation and they also refuse to provide the margins and indices utilized in order to calculate the interest rate. The Defendants state that Plaintiffs can figure out how these margins and indices were calculated. If that is the case, then it would be even easier for the Defendants to provide that information to the Plaintiffs since they are the ones charging the Plaintiffs and have access to the software that makes this possible. Plaintiffs do not have access this software.

The basic issue is that the Defendants failed to comply with the various laws cited. The Defendants are basically stating that they cannot understand the SAC, yet they can easily point out "errors" in the complaint. If the SAC is confusing, they would be unable to cite anything. Plaintiffs respectfully moves the court in light of the Plaintiffs *pro se* status, that the Court hold them to a less stringent standard than formal pleadings drafted by an attorney and construe liberally. *See Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 596, 30 L.Ed. 2d 652 (1972).

## III. Fair Credit Reporting Act is Not Time Barred

FCRA claims must be brought within two years of the plaintiff's discovery of the "violation that is the basis for . . . liability," but in no event more than five years after the date of such violation. 15 U.S.C. § 1681p. In the context of a consumer's dispute triggering a CRA's

5

reinvestigation duties, the date of the violation that begins the limitations period is thirty days after communication of the dispute to the CRA, which is when the CRA's reinvestigation must be completed, *Briley v. Burns Int'l SAFETOHIRE.COM, Inc.*, 78 Fed. Appx. 481 (6th Cir. 2003); *Anderson v. Equifax Info. Serv. L.L.C.*, 292 F. Supp. 3d 1211, 1219–1220 (D. Kan. 2017); *Broccuto v. Experian Info. Solutions Inc.*, 2008 WL 1969222 (E.D. Va. May 6, 2008).

Unfortunately, consumers may find themselves disputing known inaccurate information for more than two years after their first dispute. These older claims may well be time-barred, but each new dispute within the limitations period creates new reinvestigation obligations whose breach is subject to a new two-year statute of limitations. *Broccuto v. Experian Info. Solutions Inc.*, 2008 WL 1969222 (E.D. Va. May 6, 2008); Larson v. Ford Credit, 2007 WL 1875989 (D. Minn. June 28, 2007). *Bittick v. Experian Info. Solutions, Inc.*, 419 F. Supp. 2d 917 (N.D. Tex. 2006). Also, the evidence supporting the time-barred claims still may be relevant and admissible regarding the current violation. See, e.g., *Bryant v. TRW, Inc.*, 487 F. Supp. 1234, 1236 (E.D. Mich. 1980), aff'd, 689 F.2d 72 (6th Cir. 1982); *Lazar v. Trans Union, L.L.C.*, 195 F.R.D. 665 (C.D. Cal. 2000).

However, the furnisher may not limit its investigation to only that information supplied by the CRA., *Gorman v. Wolpoff & Abramson, L.L.P.*, 584 F.3d 1147 n.11 (9th Cir. 2009) ("In deciding that the notice determines the nature of the dispute to be investigated, we do not suggest that it also cabins the scope of the investigation once undertaken."); *Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611 (6th Cir. 2012) (reversing summary judgment for the furnisher whose "policy prohibited its employees from performing anything more than a cursory confirmation" of its own records that listed the consumer's disputed status as an obligor on the challenged account because the furnisher "received notice regarding the specific nature of Boggio's underlying

6

dispute," and therefore "a reasonable investigation under the circumstances would require that USAA review the relevant, underlying documentation"). See also *Drew v. Equifax Info. Serv., L.L.C.*, 690 F.3d 1100 (9th Cir. 2012) ("Ultimately, as we have noted in Gorman, an inadequate CRA notification may limit the scope of a furnisher's § 1681s-2(b) duty, for example, by excusing a more limited investigation; it does not, however, eliminate the duty altogether." (emphasis in original)). For instance, the furnisher must also consider other information available to it, including earlier complaints or other communications received from the consumer before reinvestigation was even begun. See also *Humphrey v. Trans Union L.L.C.*, 759 Fed. Appx. 484 (7th Cir. 2019) (reversing summary judgment for student loan furnisher that successfully argued below "that the CRAs did not provide it with sufficient information about Humphrey's dispute"; "reasonable jury could infer that Navient had sufficient notice of the nature of the dispute, or, alternatively, that any deficiency of information resulted from Navient's own failure to conduct a reasonable investigation, which should have turned up Humphrey's letters, documentation about his phone calls, and his rejected applications"); *Perry v. Toyota Motor Credit Corp.*, 2019 WL 332813 (W.D. Va. Jan. 25, 2019) (sustaining claim alleging that furnisher "only reviewed its internal system and ultimately furnished the same information back to the CRAs . . . [and] did not review its previous communications with [the consumer] when investigating the dispute"); *Heard v. Nationstar Mortg. L.L.C.*, 2018 WL 4028116 (N.D. Ala. Aug. 23, 2018) (rejecting furnisher's defense based on CRAs' "vague" notices dispute involved "a specific factual issue" that consumers "had raised many times"'; "Even if the credit agencies gave a less than detailed description of the Heards' dispute, this did not relieve Nationstar of its responsibility to review documents in its possession."); *Daugherty v. Equifax Info. Services, L.L.C.*, 2015 WL 6456572 (S.D. W. Va. Oct. 26, 2015) (denying summary judgment on claim that furnisher engaged in "a

mere 'data conformity' review" because it limited itself to "brief reviews of internal records" when it had additional information available for review about potential inaccuracies), later opinions sub nom, *Daugherty v. Ocwen Loan Servicing, L.L.C.*, 2016 WL 6650856 (S.D. W. Va. Oct. 12, 2016) (following jury verdict awarding plaintiff $6128 actual damages and $2,500,000 punitive damages, denying furnisher's post-trials for remitter, new trial, etc. and awarding plaintiff reasonable attorney fees); *Seungtae Kim v. BMW Fin. Services*, 142 F. Supp. 3d 935 (C.D. Cal. 2015) ("Defendant should have considered information it received directly from Plaintiff" through the earlier § 1681s-2(a)(8) dispute in conducting its § 1681s-2(b) investigation), aff'd, 702 Fed. Appx. 561 (9th Cir. 2017); *McDonald v. OneWest Bank*, 2013 WL 858197 (W.D. Wash. Mar. 7, 2013) (denying the furnisher summary judgment where it knew from the consumer's on-going correspondence the details of the dispute but "did nothing more than compare the points of data provided by the CRA with its own records"); *Darrin v. Bank of Am.*, 2013 WL 877087 (E.D. Cal. Mar. 7, 2013) (denying dismissal because the allegations established that bank had consented in writing to a specific loan modifications, yet the furnisher verified to CRAs that the payments made in conformity therewith were made late).

The CFPB has supported this position, stating its expectation that furnishers "review and consider 'all relevant information' relating to the dispute, including documents that the CRA includes with the notice of dispute or transmits during the investigation, and the furnisher's own information with respect to the dispute.", Consumer Fin. Prot. Bureau, The FCRA's Requirement to Investigate Disputes and Review "All Relevant" Information Provided by Consumer Reporting Agencies (CRAs) About the Dispute, CFPB Bulletin 2013-09 (Sept. 4, 2013) (emphasis added). See also *Hill v. Ocwen Loan Servicing, L.L.C.*, 369 F. Supp. 3d 1324 (N.D. Ga. 2019) (sustaining claim where furnisher allegedly "failed to review its own records regarding

the date of the first delinquency on the mortgage" and accordingly failed to "remove the aged-off loan from the consumer report").

The CFPB has also cited furnishers who failed to have policies and procedures to instruct dispute handlers to properly conduct a reasonable investigation, including directing them to "compare the disputed information to all available information in all systems of record that could contain information relevant to a consumer's dispute."

Ultimately, the standard for FCRA compliance is reasonableness, and therefore a furnisher who has "additional information at its disposal to at least clarify . . . insufficient notification" from the CRA and who fails or refuses to refer to and act on that clarifying information will still be liable if its conduct is unreasonable, so long as it is otherwise notified by the CRA of the consumer's dispute. Even in the absence of additional or new information, the furnisher must still re-investigate a renewed dispute in the absence of proof that the previous investigation was in fact reasonable. Id. See also *Hudson v. Babilonia*, 192 F. Supp. 3d 274 (D. Conn. 2016) ("If NSI's previous investigation was unreasonable, however, it would not be entitled to rely on the results of that investigation in responding to the ACDVs."); *O'Connor v. Wells Fargo*, 2014 WL 3058373, at *3 n.5 (N.D. Cal. July 3, 2014).

As succinctly stated by the FTC: "[t]he furnisher's investigation must be reasonable under the circumstances. It may be either simple or complex, depending on the nature of the dispute." FTC Staff Summary § 623(b) item 2, reproduced at Appx. D, infra. Accordingly, a reasonable investigation may require a furnisher to go beyond its own records and obtain information from a third party. *Van Veen v. Equifax Info.*, 844 F. Supp. 2d 599 (E.D. Pa. 2012) (summary judgment for furnisher denied when consumer claimed that furnisher had previously acknowledged its inaccurate reporting yet furnisher verified the tradeline "[p]ursuant to [its]

standard procedures . . . [whereby] the analyst only verified Plaintiff's existing account information" and therefore without considering the actual dispute); *Carlisle v. Nat'l Commercial Serv., Inc.*, 2015 WL 4092817 (N.D. Ga. July 7, 2015) (furnisher/debt collector's investigation, comprised of merely confirming with creditor that amount owed was accurately stated, was insufficient where the consumer's dispute showed that creditor had provided conflicting amounts; reasonable investigation would require furnisher to, "at a minimum, obtain an explanation for the differing amounts [the creditor] reported to the consumer or some other information showing that [the creditor] researched the actual dispute presented.

For example, the FTC, in its first enforcement action under section 1681s-2, imposed the requirement that the furnisher must refer to original account records, and even consult third parties when necessary, to actually investigate the merits of a dispute. Thus, according to the FTC, a furnisher cannot merely rely on the disputed information itself, but must verify the debt with the original account records in its or the original creditor's possession. Id. Cf. *Carlisle v. Nat'l Commercial Services, Inc.*, 2015 WL 4092817 (N.D. Ga. July 7, 2015) (furnisher/debt collector's investigation, comprised of merely confirming with the creditor that the amount owed was accurately stated, was insufficient where the basis for the consumer's dispute showed that creditor had provided conflicting amounts; reasonable investigation would require furnisher to, "at a minimum, obtain an explanation for the differing amounts [the creditor] reported to the consumer or some other information showing that [the creditor] researched the actual dispute presented"). If no original records exist, the FTC required that the information be deleted.

Solis1 re-disputed the accuracy of the CITIBANK tradeline on her Experian and Equifax credit reports on October 30, 2015 and July 30, 2015 respectively. Solis1 disputed the tradeline directly with the CRAs and the Defendants failed to properly re-investigate. Not only did the

Defendants fail to properly re-investigate, they continued to report inaccuracies to the CRAs. Solis1 sent QWRs directly to CITI throughout eight years asking about the interest calculated yet CITI refused to provide the information to Solis1 and failed to correct the inaccurate tradeline when it knew that some interest was "deemed uncollectible" whatever that means. CITI failed to conduct a reasonable investigation and is hiding behind "Solis1 did not provide what was wrong in her tradeline when she disputed with the CRAs" all the while having in their possession, eight years' worth of QWRs and debt validation letters disputing the amounts owed and how the interest rate and interest amounts owed were calculated. According to the above referenced case law, CITI had a duty to review the tradeline more intensely due to their receipt of direct disputes from Solis1.

Plaintiff received proof of the inaccurate reporting to the FCRA when Plaintiff discovered the deceleration letter in January 2018 and in about May 2018, CMI reduced some of the interest owed in response to Solis1's letters about the deceleration. Solis1's suspicions were confirmed that the Defendants had been reporting the amounts due incorrectly to the credit reporting agencies (CRAs) due to the deceleration letter. Thereafter, Solis1 repeatedly sent letters regarding how the deceleration affected the amount owed. Incredibly, in none of the responses Defendants sent to Solis1's letters prior to 2018, did they tell Solis1 that there had been a deceleration and deprived the Plaintiffs of an opportunity to cure the HELOC. Regardless, Plaintiffs filed their complaint within the two year time limit of the discovery of the inaccurate interest amount owed in May 2018, which is also within the total five year statute of limitations for the FCRA.

Solis1 was damaged due to the inaccurate reporting because she did not know what was owed and Defendants refused to inform her despite having access to all of the data calculation

11

software it utilizes to calculate amounts owed and interest rates. Instead of having the answer directly from the Defendants, Solis1 had to constantly try to find out what was owed and how it was calculated. Not surprisingly the Defendants still say they don't know what Plaintiffs are pleading but they keep stating Plaintiffs are not damaged despite the stress, emotional and mental anguish of not knowing if they are going to keep their home because Defendants refuse to answer multiple letters regarding how the interest rate and interest amounts owed were calculated so that Plaintiffs may resume payment. The Defendants deprived the Plaintiffs of this basic information in addition to depriving the same to all the other consumers that resulted in the Defendants being fined by the Consumer Financial Protection Bureau.

## IV. Florida Consumer Collection Practices Act

The Defendants have repeatedly requested the wrong amounts due on the monthly statements as confirmed by the CMI letter waiving over ten thousand dollars in fees received by the Plaintiffs in May 2018. These are violations of the FCCPA and litigation privilege cannot be claimed over actions done by the Defendants prior to litigation. Plaintiffs have the Account Summary(s) which have the wrong amounts due and owing according to CMI's letter waiving interest fees. Litigation privilege does not protect deliberate deception to the court and the failure to provide the evidence they claim. If there is such a thing as a HELOC note, the Plaintiffs would like to see it. Credit cards and credit lines are not promissory notes. The HELOC is not easily calculated because it does not state the index and margin used to calculate the interest rate. The HELOC establishes "[t]he maximum amount of borrowing power extended to a borrower by a given lender, to be drawn upon by the borrower as needed." See Line of Credit, Black's Law Dictionary, 949 (8th ed. 1999). Attaching a HELOC Agreement to a foreclosure complaint and calling it a note is deceptive. The foreclosure action in state court is wrongful in that it violates

12

the FCCPA by stating an amount owed when the amount owed has not been established prior to filing the action despite the years of requests for the interest amount calculated. The FCCPA is clear that the amount the creditor requests cannot be an incorrect amount. The FCCPA count is not against litigation privilege but the fact that CITI's monthly account summaries were inaccurate and therefore the amounts reported to the CRAs was also inaccurate and also a violation of the FCRA.

## V. Breach of Contract

There was an agreement between Solis1 and CITI. CITI breached the contract when it failed to respond to Solis1's multiple letters regarding the interest rate, interest amount due and its calculations. Defendants unsurprisingly are stating they did not breach the contract despite failing to respond to multiple letters requesting the interest rate calculations and the interest amount due. Defendants also claim that the letters Solis1 sent do not request interest calculations when they are clearly requested in the letters. Plaintiffs are consumers and when they are questioning their bill, they are not supposed to answer their own questions by figuring out their own calculations with an adjustable rate line of credit that changes daily. CITI created that agreement and it also contained an initial teaser rate and the Plaintiffs do not know how to calculate it. If that is the case, then the Plaintiffs calculate they owe zero to the Defendants and the Defendants should just accept this answer and stop the foreclosure process immediately. This case can be dismissed upon the fact that the Plaintiffs calculate they owe zero to the Defendants because the Defendants refuse to assist them in calculating the correct amounts due. That is the conclusion the Plaintiffs have reached according to the Defendants' logic.

## VI. Fair Credit Billing Act

The Fair Credit Billing Act (FCBA) in 1974 added a number of important substantive protections for open-end credit to TILA. These protections included a minimum grace period, the prompt crediting of refunds, refund of credit balances, and the right to raise claims and defenses that the consumer has against the merchant. However, it is the billing error procedures that are popularly referred to as the "Fair Credit Billing Act." The FCBA's billing error procedures are located at 15 U.S.C. § 1666. See also *Jacobs v. Marine Midland Bank, N.A.*, 475 N.Y.S.2d 1003 (N.Y. Sup. Ct. 1984). provide a powerful remedy for consumers who have a dispute with creditors over an open-end credit account. The procedures arose from the recognized difficulty for a consumer in dealing with computerized records. As the lead sponsor of FCBA, Senator William Proxmire, stated:

In their haste to computerize, some creditors have neglected the human element. Consumers have complained about the inordinate amount of trouble they have had in resolving a relatively simple billing error. . . . All too often their inquiries go unanswered while the computer relentlessly grinds out dunning letters threatening the consumer with a bad credit rating if he does not pay, <u>A Bill to Amend the Truth in Lending Act to Protect Consumers Against Careless and Unfair Billing Practices, and for Other Purposes</u>: Hearing Before the Subcomm. on Fin. Inst. Of the Senate Comm. on Banking, Housing and Urban Affairs, 92d Cong. 1 (1971).

The FCBA has the effect of making the creditor listen to the consumer who has a dispute about a computerized bill or who does not understand the bill, See *Lyon v. Chase Bank USA, N.A.*, 656 F.3d 877, 885 (9th Cir. 2011) ("Congress's clear intent in adopting the FCBA was to prevent a creditor from simply ignoring a billing dispute when attempting to collect a debt"); *Gray v. Am. Express Co.*, 743 F.2d 10, 13 (D.C.Cir.1984) ("The Fair Credit Billing Act seeks to prescribe an orderly procedure for identifying and resolving disputes between a cardholder and a

card issuer as to the amount due at any given time."). The FCBA provisions apply to "creditor," a TILA term of art. 15 U.S.C. § 1602(g); Reg. Z § 1026.2(a)(17)

The Ninth Circuit recently articulated this reasoning in the context of a violation of the Fair Credit Billing Act:

> Whether "detrimental reliance" has anything to do with causation to support an award of actual damages resulting from violations of the FCBA appears to be a question of first impression. We conclude that applying such a requirement to the FCBA violations admitted here would distort the analysis of causation and thereby contradict the purpose of § 1640(a)(1). As noted, § 1666(a)(3)(B) requires a creditor who is timely notified of a billing dispute to either "make appropriate corrections in the account of the obligor" or "send a written explanation or clarification to the obligor." Chase did neither and then undertook collection actions prohibited by the statute if it did not meet this obligation. See 15 U.S.C. §§ 1666(a)(3)(B), 1666a(a). There is simply no relevant disclosure or conduct under these circumstances that Lyon could have relied upon. Thus, Lyon's lack of detrimental reliance is immaterial to a determination of whether Chase's violations resulted in actual damages. If Chase's argument were to be followed in cases of defiant refusal to comply with § 1666(a)(3)(B), the bank has discovered that silence is truly golden.

To require evidence of detrimental reliance on an unmade explanation would necessarily bar recovery of actual damages because such evidence could never exist. Consumers cannot rely on unmade explanations, and creditors could simply avoid actual damages under the FCBA by never responding to billing disputes—the exact conduct the statute aims to prevent. Such an irrational requirement would contradict the express language of § 1640(a)(1) that a civil plaintiff can recover actual damages resulting from any violation of the FCBA. . . . Accordingly, we hold that evidence of detrimental reliance is not required to support an award of actual damages resulting from violations of 15 U.S.C. § 1666 or § 1666a, *Lyon v. Chase Bank USA, N.A.*, 656 F.3d 877, 887–888 (9th Cir. 2011) (emphasis added). Cf. *Williams v. Select Portfolio Serv., Inc.*,

2016 WL 9450471, at *14–15 (N.D. Ga. Aug. 11, 2016) (denying note owner's motion for judgment on pleadings related to TILA § 1641(g) claim for actual damages due to failure to provide timely notice of transfer of ownership; no discussion or application of detrimental reliance); *Kemply v. Cashcall, Inc.*, 2016 WL 1055251, at n.10 (N.D. Cal. Mar. 16, 2016) (refusing to apply TILA's detrimental reliance standard to a violation of the EFTA's prohibition against conditioning an extension of credit on borrowers' repayment by means of preauthorized electronic funds transfers in § 1693k; citing Lyon). But cf. *Borowski v. BNC Mortg., Inc.* 2013 WL 4522253, at *6 (W.D. Wash. Aug. 27, 2013) (pro se) (applying detrimental reliance standard in the context of an alleged failure to provide a § 1641(g) notice without any discussion).

The Defendants are confused regarding the Fair Credit Billing Act (FCBA) which is shocking because the Defendants' business is to provide mortgages, loan modifications, HELOCs, credit cards and many other financial instruments. They should be aware of the FCBA. The HELOC is NOT a mortgage loan. The HELOC is a credit line that is secured by real estate, it is not a fixed, closed end loan. The HELOC is used like a credit card, paying down the line and then using it again. The amounts due can be different from month to month. The FCBA procedures apply to all types of open-end credit accounts, including consumer credit cards and home equity lines of credit. 15 U.S.C. § 1666; Reg. Z § 1026.13(a) However, the general consensus is that they do not apply to closed-end credit because both the Act and Regulation Z refer to billing errors in the context of periodic statements, which are only required for open-end credit. 15 U.S.C. § 1666; Reg. Z § 1026.13(a). See *LaPrade v. Abramson,* 2006 WL 3469532 (D.D.C. Nov. 29, 2006) (since department store did not extend open-end credit to consumer, it was not obliged to send periodic statements and thus billing error procedures did not apply). See also *James v. McAdam,* 2012 WL 5265987 (M.D. Fla. Oct. 23, 2012) (pro se) (dismissing

complaint where consumer failed to allege facts showing that the telephone or utility account met the definition of open-end credit in Reg. Z § 1026.2(a)(20)). Thus, a number of courts have declined to apply the billing error procedures to closed-end credit. See, e.g., *Rajapakse v. Credit Acceptance Corp*, 2019 WL 422236, at *4 (E.D. Mich. Jan. 30, 2019), adopted, *McLean v. Big Dog Group*, L.L.C., 2016 WL 3211514, at *9 (M.D. La. Mar. 11, 2016) (FCBA inapplicable to closed-end auto loan); *Foster v. PNC Bank, N.A.*, 2015 WL 8601656, at *3 (N.D. Ill. Dec. 14, 2015) ("FCBA obligates creditors who offer open-end credit plans to communicate with consumers to resolve billing errors"; dismissing FCBA claims involving various mortgages except for one claim involving HELOC); *McPhail v. Wells Fargo Dealer Servs.*, 2013 WL 3545201 (E.D.N.C. July 22, 2013) ("courts have consistently held that the FCBA applies only to open-ended credit plans," quoting *Fadia v. U-Haul*, Inc., 2010 WL 3211075, at *5 and citing numerous cases); *Peart v. Shippie*, 2008 WL 11332042, at *4 (S.D. Fla. Nov. 10, 2008) (FCBA does not apply to auto loan with fixed schedule), aff'd in part, rev'd in part on other grounds, 345 Fed. Appx. 384 (11th Cir. 2009) (FCBA claim abandoned on appeal.

In one of the first cases to consider the issue, the Maryland Court of Appeals ruled that FCBA does not apply to a closed-end, retail installment sales agreement which did not involve the use of a credit card, noting that despite some ambiguity in the statutory language, Regulation Z has always expressly defined the scope of FCBA as limited to open-end credit. Bailey v. Capitol Motors, Inc., 513 A.2d 912 (Md. Ct. Spec. App. 1986) Similarly, the FCBA has been found not to apply to closed-end mortgages, *Asper v. Wells Fargo Bank*, 2018 WL 2287331, at *4 (S.D. Cal. May 18, 2018) (dismissing FCBA claim where consumer did not allege mortgage was open-end credit); *Nichols v. BAC Home Loans Servicing L.P.*, 2013 WL 5723072 (N.D.N.Y. Oct. 18, 2103) (pro se) (FCBA does not apply to closed-end mortgage); *Strobman v. Bank of Am.*

*Corp.*, 852 F. Supp. 2d 1366, 1374 (N.D. Ga. 2012) (FCBA's protections do not extend to a mortgage unless a HELOC); *Wilson v. Home Builders Fin., Inc.*, 2011 WL 5024363 (D.S.C. Sept. 27, 2011) (noting that 15 U.S.C. § 1602(f) mentions that the requirements of part D of TILA are "by their terms applicable only to creditors offering open-end credit plans"—note that § 1602(f) has now been renumbered as § 1602(g)), adopted by 2011 WL 5024353 (D.S.C. Oct. 20, 2011.

Plaintiffs have clearly attached a Home Equity Line of Credit Agreement which constitutes an open-end credit relationship created by CITI. Plaintiffs have disputed the interest owed, the amount is unknown because the Defendants have refused to provide to the Plaintiffs the margins and indices utilized to calculate the interest. Solis1 paid interest until she found out that Defendants were involved in rigging the LIBOR rates. LIBOR may be phased out in 2021. The Defendants' actions affected the entire market of adjustable rate loans and credit lines for many years. Due to the Defendants' actions, the Plaintiffs needed to verify the amount that was to be paid and have been diligent in attempting to communicate with the Defendants. The Defendants refuse to provide to the Plaintiffs the index utilized to calculate the interest rate in breach of its contract with Solis1 even when requested through the Production of Documents.

## CONCLUSION

The Defendants should not be dismissed when they have clearly violated their own agreement, the FCBA and FCRA and caused substantial emotional and economic damages to the Plaintiffs. The Plaintiffs have(d) to pay attorneys to defend their foreclosures when all they have been trying to do is find out what is truly owed. Plaintiffs are not at fault for Defendants' actions in providing inaccurate information to the credit reporting agencies and providing inaccurate information in its monthly account statements. Defendants deprived the Plaintiffs of the

opportunity to cure the HELOC by not informing the Plaintiffs about this opportunity each time the Plaintiffs attempted to communicate with the Defendants. Inartful pleading should not deny the Plaintiffs their day in court to confront the Defendants' egregious violations of consumer law that have emotionally and economically damaged the Plaintiffs. Furthermore, the plethora of the FCRA case law supports the Plaintiffs' position that the Defendants had a duty to conduct a reasonable investigation when receiving Solis1's dispute through the CRAS and to include in its reviews all of Solis1's previous direct communication with them which span over an eight year period. Defendants continual failure to provide the margins and indices utilized to calculate the interest rate could have been done by them in 2010 and the Plaintiffs could have resumed in making payments. The fact that the Defendants refuse to provide this information in the discovery stage of this case makes their foreclosure amounts due in State Court suspect and therefore they should be forbidden to continue the foreclosure until this information is provided to the Plaintiffs and the Plaintiffs have an opportunity to review the amounts owed. This is the only fair and legal resolution to this issue that the Plaintiffs have tried to obtain since 2010. The Defendants are thumbing their noses at consumer laws designed to protect the little people, of which the Plaintiffs are part.

WHEREFORE, Plaintiffs respectfully move the Court to deny the Defendants' Motions to Dismiss the Second Amended Complaint and grant the Plaintiffs leave to Amend the Second Amended Complaint if the Court desires.

Respectfully submitted,

_____
Grace Solis
730 86th Street

Dated: September 1, 2020

_____
Shirley Solis
730 86th Street

Miami Beach, FL  33141                                    Miami Beach, FL  33141

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been delivered

by USPS to:

Christopher A. Roach
Counsel for the Defendants
Adams and Reese LLP
101 E. Kennedy Blvd., Ste. 4000
Tampa, FL  33602